J-A10014-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: H.E.F., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.F., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2343 EDA 2020 |

Appeal from the Order Entered December 1, 2020
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-AP-0000873-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: H.E.F., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.F., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2344 EDA 2020 |

Appeal from the Order Entered December 1, 2020
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-DP-0003005-2017

BEFORE:  PANELLA, P.J., OLSON, J., and COLINS, J.[*]

MEMORANDUM BY PANELLA, P.J.:          **FILED AUGUST 10, 2021**

Following an evidentiary hearing, the Court of Common Pleas of Philadelphia County entered an order involuntarily terminating the parental rights of C.F. ("Father") to H.E.F. ("Child"). The trial court also simultaneously

---

[*] Retired Senior Judge assigned to the Superior Court.

entered an order changing Child's permanency goal to adoption.[1] Father separately appealed both orders, arguing that he "substantially completed" the objectives of his single case plan and the trial court therefore erred by terminating his parental rights and changing Child's permanency goal to adoption. As we conclude that there was no error on the part of the trial court, we affirm.

At Child's birth on November 5, 2017, Child tested positive for multiple substances, including heroin. Father contested paternity. The Philadelphia Department of Human Services ("DHS") obtained an order of protective custody and placed Child in the care of her maternal aunt. Child remains in the care of the aunt ("kinship aunt").

At the scheduled adjudicatory hearing on November 21, 2017, the court deferred the adjudication pending the results of the paternity test. Father appeared at the hearing and the court referred Father to the Clinical Evaluation Unit ("CEU") for a drug screening, and he tested positive for marijuana. The paternity test results subsequently confirmed Father was the biological father of Child.

The court held an adjudicatory hearing on January 4, 2018, and adjudicated Child dependent. The court once again referred Father to CEU for a drug screening, a dual diagnosis (substance abuse and mental health)

---

[1] Child's biological mother voluntarily relinquished her parental rights to Child, and that relinquishment is not part of this appeal.

assessment and monitoring, and three random drug screens. The court also set objectives for Father to obtain appropriate housing and employment.[2] Father was granted weekly supervised visits with Child. Father tested positive for marijuana on January 4, 2018, and then for opiates on March 19, 2018.

The Court held permanency review hearings on April 4, 2018, June 27, 2018, and September 27, 2018. Father attended those hearings and was referred to the CEU for drug screens. The CEU reported that Father tested positive for opiates on April 4, 2018, refused a drug screen on June 27, 2018, and tested positive for opiates on September 27, 2018. The June 27, 2018, permanency review order directed Father to attend parenting classes, and the September 27, 2018, permanency review order documented that Father had completed those parenting classes.

The trial court held another permanency review hearing on December 18, 2018. At this hearing, the CEU report reflected that Father was engaged in a dual diagnosis program and had received negative results for his drug screenings on October 15, 2018, November 7, 2018, and December 3, 2018. The court referred Father to Family School, an intensive parenting program. However, a subsequent CEU report indicated that Father had once again tested positive for marijuana on May 9, 2019.

---

[2] The record is not clear as to exactly when the housing and employment objectives were included in Father's single case plan, but none of the parties dispute that Father was given these objectives.

On November 29, 2019, DHS filed both a petition to involuntarily terminate Father's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (a)(2), (a)(5) and (a)(8) and (b) as well as a petition to change Child's permanency goal to adoption. Father tested positive for benzodiazepines and marijuana on December 16, 2019. After multiple continuances, the goal change and termination hearing was scheduled for December 1, 2020.

The Community Umbrella Agency ("CUA") case manager supervisor, Shari Henderson, testified at the hearing. She testified that Child came into DHS's care because of drug concerns with both biological parents. *See* N.T. Hearing, 12/1/20, at 13. She stated that CUA had established multiple single case plan objectives for Father, which included participating in substance abuse and mental health treatment and parenting classes, obtaining appropriate housing and employment, and attending visits. *See id*. at 14-15. She confirmed that Father was aware of these objectives. *See id*. at 15.

Henderson testified that Father had struggled with his drug addiction and had not been able to maintain his sobriety. *See id*. at 15-16, 31. She explained that although Father was reportedly attending a drug and alcohol treatment program at the time, CUA had not been able to obtain any updates on his progress. *See id.* at 22-23. According to Henderson, Father had not been successful in completing a drug and alcohol program at the time of the hearing. *See id.* at 16. She stated that he had also not successfully completed his mental health treatment objectives and that she had "never [been] given

anything about any mental health treatment [Father] received." *Id.* at 34, 37. She also testified that Father did not have appropriate housing, was not employed, and had been "no-shows" to all but one of his CEU random drug tests. *See id.* at 20, 21, 36-37, 44-45.

Henderson also acknowledged that Father had completed parenting classes and Family School. *See id.* at 34, 45. She stated that Father regularly attended his weekly supervised visits with Child, and those visits, for the most part, were "fine." *Id.* at 21. However, she reported that on a visit with Child on September 25, 2020, the CUA outcome specialist who was supervising the visit had to stop the visit and have the kinship aunt pick Child up early because Father was acting erratically and appeared to be under the influence of drugs. *See id.* at 18-19. Father fell asleep and could not be woken for over two hours, when the police were finally called to remove Father from the building. *See id.* at 19.

Henderson also explained that Child saw the visits with Father as more of a playdate, *see id.* at 32, and that Child looked to her kinship aunt and uncle for all of her needs. *See id.* at 30, 33. According to Henderson, Child was "thriving just beautifully in [her kinship] home," where she is "a very important part of the family." *Id.* at 28, 30. Henderson testified that Child calls her kinship aunt and uncle "mommy" and "daddy" and that their home is the only home Child has ever known. *See id.* at 14, 30-31. Henderson opined that it was in Child's best interests to have her permanency goal

changed to adoption because "she's in the best possible environment she can be right now." *Id.* at 31.

Father testified at the hearing as well. He testified that he had entered rehab and "detox" at the Behavioral Wellness Center at Girard, *see id.* at 50, 56, and that he was currently enrolled in a substance abuse and mental health treatment program. *See id.* at 49-50, 52, 57. According to Father, he had "been in [the program for] over a month." *Id.* at 50. Father stated that, contrary to Henderson's assertions, he did have appropriate housing as he lived in his grandmother's row home. *See id.* at 51. Father conceded that Child's maternal aunt "takes care of [Child] wonderfully" but he felt that he was ready to parent Child. *Id.* at 53-54.

Following the testimony, the trial court made the following statements:

This Court has heard testimony that [Child] has been placed for approximately 36 months, her entire life, and with the same foster parents.

The testimony is credible that [F]ather has failed to comply with his single case plan objectives, and he has not made progress to alleviate the need for placement.

The credible testimony reflects that [Child] is thriving in the home of the foster parents, and has bonded with them. It is this court's finding that it is in her best interest to be freed for adoption.

Inasmuch as [F]ather has made some progress, it appears that he did not become serious until after the filing of the termination petition. It has been shown that this repeated incapacity and failure to provide essential parental care - it's clear that he's not really interested in parenting [Child].

The testimony was that [Father] visits regularly, but it's nothing more than a play date, and that [Child] is ready to go home with

the foster parents, with whom she's bonding, and looks to for comfort, her care, and day-to-day meeting of her needs.

The parental rights of [Father] are terminated, therefore.

*Id.* at 73-74.

That same day, the court issued an order involuntarily terminating Father's parental rights pursuant to Sections 2511(a)(1), (a)(2), (a)(5) and (a)(8) and Section 2511 (b) as well as an order changing the permanency goal for Child to adoption. Father filed a timely notice of appeal in each matter, and this Court consolidated the matters *sua sponte*. Father raises three issues in his brief:

A. Whether [DHS] failed to prove by [clear] and convincing evidence that [F]ather's parental rights should have been terminated pursuant to 23 Pa. C.A. § 2511(a)(1), (2), (5) and (8) since he had substantially completed his single case plan objectives as required to have [Child] returned to him?

B. Whether [t]here was a strong emotional and parental bond between [Father] and [Child] which would have had a negative effect on [Child] if the parental bond was permanently severed?

C. Whether [DHS] failed to prove by [clear] and convincing evidence that the permanency goal should be changed to adoption where [Father] had substantially completed his single case plan objectives as required to have [Child] returned to him?

Appellant's Consolidated Brief at 5.

We begin by addressing Father's first two claims, which challenge the trial court's order terminating his parental rights. When this Court reviews such an order, we must accept the findings of fact and credibility determinations of the trial court as long as the record supports them. *See In*

*the Interest of D.R.-W.*, 227 A.3d 905, 911 (Pa. Super. 2020). If the findings of fact are supported by the record, this Court may only reverse the order if the trial court made an error of law or abused its discretion. *See id*. We may not reverse merely because the record could support an alternate result. *See id*. Instead, we give great deference to the trial court because trial courts often have the opportunity to observe the parties first-hand over the course of multiple hearings. *See In re Adoption of K.M.G.*, 219 A.3d 662, 670 (Pa. Super. 2019). Further, the trial court, as the fact-finder, is free to believe all, part or none of the evidence presented and is likewise free to resolve any conflicts in the evidence. *See id*.

Termination of parental rights is controlled by Section 2511 of the Adoption Act. *See* 23 Pa.C.S.A. § 2511. Under Section 2511, a trial court must engage in a bifurcated process prior to terminating parental rights. *See In re L.M*., 923 A.2d 505, 511 (Pa. Super. 2007). Initially, the trial court must find that the party seeking termination has proven by clear and convincing evidence that the parent's conduct satisfies any one of the eleven statutory grounds set forth for termination under Section 2511 (a). *See id.;* 23 Pa. C.S.A. § 2511 (a)(1-11). If the trial court finds that one of those subsections has been satisfied, it must then, pursuant to Section 2511(b), make a determination of the needs and the welfare of the child under the best interests of the child standard. *See In re L.M.*, 923 A.2d at 511; 23 Pa.C.S.A. § 2511(b).

Here, regarding the first prong of the analysis, the trial court found that DHS had proven by clear and convincing evidence that Father's conduct met the grounds for termination of his parental rights under Sections 2511 (a)(1), (a)(2), (a)(5) and (a)(8). Father does not challenge the subsections individually, but rather makes the broad assertion that the trial court erred by terminating his parental rights under all four subsections given that he had, according to Father, substantially completed his objectives for reunification. This Court has made clear that it only needs to agree with the trial court that DHS met its burden as to any one subsection in order to affirm the termination of parental rights. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we conclude that the trial court correctly determined that DHS met its burden pursuant to Section 2511 (a)(1), which provides that parental rights may involuntarily be terminated on the grounds that:

> The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa. C.S.A. § 2511(a)(1).

> In defining what constitutes parental duties, this Court has stated that:

> Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. ... [Rather,] the parental obligation is a positive duty which requires affirmative performance … A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles. … Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's

parental responsibilities while others provide the child with [their needs].

*In re Z.P.*, 994 A.2d 1108, 1118-1119 (Pa. Super. 2010) (citation omitted)

When a petition is filed under Subsection (a)(1), the court must not consider any efforts by the parent to remedy the conditions described in the petition that the parent first initiated after being given notice of the filing of the petition. *See* 23 Pa.C.S.A. § 2511(b).

We agree with DHS that the trial court here properly concluded that Father failed to perform parental duties for at least a six-month period prior to the filing of the termination petition. As DHS cogently explained:

> Here, the record is clear that Father neglected his parental duties by failing to make meaningful progress with his SCP objectives. ...
>
> First, Father did not meet his primary objective of achieving sobriety. Importantly, Child came into care due to parental substance abuse concerns. To help him work on his addiction, the trial court repeatedly referred Father to the CEU for dual diagnosis assessments and drug screens. Despite this, Father refused to comply when asked by CUA to submit [to] random drug screens and did not sign releases of information for CUA or the CEU to monitor his treatment on an ongoing basis.
>
> The record reflects that Father continued to abuse drugs. The CEU reported that Father tested positive for opiates on April 4, 2018; refused a drug screen on June 27, 2018; and tested positive for opiates on September 27, 2018. … Father further tested positive for cannabis on May 9, 2018 and positive for benzodiazepine[s] and cannabis on December 16, 2019.
>
> Furthermore, at the September 25, 2020 supervised visit, Father appeared 'under the influence of a narcotic or drug.' While Father denied being high, he acted [erratically] in front of Child. … [He] fell asleep and could not be roused … for hours. Ultimately, CUA had to contact the police to remove him from the building.

Father claimed that he completed a 'detox' and 'rehab' program after the September 25, 2020 visit, at Girard on October 5, 2020. However, CUA could not verify this despite multiple attempts to contact Girard. Additionally, while Father testified at the [termination of parental rights/goal change] hearing that he was enrolled in substance abuse and mental health treatment …, Father admitted that he had only attended for one month, meaning that he did not engage in treatment until well after the filing of the [ ] petitions on November 29, 2019.

[ ] Henderson also testified that Father failed to address his mental health objective … and that Father did not have appropriate housing for reunification.

Finally, Father did not maintain legally significant contact with Child. By the [termination of parental rights/goal change] hearing, Father failed to progress past supervised visitation to help develop his relationship with Child. While Father regularly attended his weekly visits, [ ] Henderson characterized them as 'little play date[s].'

DHS Brief at 15-17 (citations to record omitted).

Despite this record, Father argues that the trial court improperly terminated his parental rights because he "substantially completed" his objectives by participating in a parenting class, finishing Family School and regularly attending the supervised visits with Child. The trial court, however, was aware that Father had made these partial steps in his single case plan objectives but the court still reached the overall conclusion that the "testimony is credible that Father has failed to comply with his single case plan objectives, and he has not made progress to alleviate the need for placement." N.T. at 74.

- 11 -

The record clearly supports this conclusion, as Henderson testified that Father had failed to successfully complete a drug and alcohol or mental health treatment program by the time of the termination and goal change hearing. And while Father points out in his brief that he was currently enrolled in a treatment program at the time of the hearing, that enrollment took place well after DHS filed the petition to terminate Father's parental rights. As the trial court stated, "it appears that [Father] did not become serious [about making progress on his single case plan objectives] until after the filing of the termination petition." *Id*. at 74. This, of course, is too late to preserve Father's parental rights under the express provisions of the Adoption Act. *See* 23 Pa.C.S.A. § 2511(b). As such, we find that Father has simply failed to demonstrate that the trial court erred or abused its discretion by finding that there was clear and convincing evidence that his parental rights should be terminated pursuant to Section 2511(a)(1).

Because we find that the trial court properly terminated Father's rights under Section 2511(a)(1), we must next review the trial court's determination pursuant to Section 2511(b) that termination was in the best interests of Child. Father does little to challenge this determination. He asserts that because he had visited Child weekly for thirty-six months and Henderson reported that the visits "went well," DHS had failed to meet its burden of demonstrating that termination would be in the best interests of Child. We disagree.

- 12 -

Here, Henderson testified that Child did not see Father as a parent, but more as a playmate. **See** N.T. Hearing, 12/2/20, at 32-33. While Father is correct that he regularly attended his two-hour, supervised visits with Child each week and Henderson characterized those visits as going well, Henderson also testified that Child comes to the visits to "play with [Father], and then, when [the kinship aunt] shows up, she's done with the playing. …[N]ow she's ready to go home [with her kinship aunt]." **Id.** at 32.

As for the kinship aunt's home, the trial court credited Henderson's testimony that Child was thriving there. She had a strong bond with the kinship family, called her aunt and uncle "mommy" and "daddy" and had become an integral part of the family. The trial court noted that the testimony established that it was Child's kinship parents - and not Father - who Child looked to for her care, her comfort, and her needs.

Based on all of the above, we simply do not agree with Father's bald assertion that there is insufficient support in the record for the trial court's determination that it was in the best interests of Child to have Father's parental rights terminated.

We note that while Father does assert in his question presented for review that "there was a strong emotional and parental bond between [Father] and [Child]," Appellant's Consolidated Brief at 5, 14, this Court has held that the mere existence of a parent's emotional bond to his child does not preclude the termination of his parental rights. **See In re N.A.M**., 33 A.3d 95, 103 (Pa.

Super. 2011). Rather, in evaluating the needs and welfare of the child, the trial court can also look to the safety needs of the child and the love, comfort, security and stability the child has with her foster parents. ***See id***. As noted above, the trial court did so here, and concluded that under the circumstances of this case, termination of Father's parental rights was in the best interests of Child. Father has not shown, nor do we find, that the trial court erred or abused its discretion in reaching this conclusion.

In his third issue, Father asserts that the trial court erred by changing Child's permanency goal to adoption. Again, we do not agree.

In considering a petition for goal change, a court shall consider: 1) the continuing necessity for and appropriateness of the placement; 2) the extent of compliance with the single case plan objectives; 3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; 4) the appropriateness and feasibility of the current placement goal for the child; and 5) a likely date by which the goal of the child might be achieved. ***See In re S.B.***, 943 A.2d 973, 977 (Pa. Super. 2008); ***see also*** 42 Pa.C.S.A. § 6351(f). The court must focus on the child and it is the "safety, permanency, and well-being of the child [that] must take precedence over all considerations." ***In re S.B.,*** 943 A.2d at 978 (citation omitted).

Once a child welfare agency's reasonable efforts to reunify a child with their parent fail, the agency must redirect its efforts towards placing the child in an adoptive home. ***See In re N.C.***, 909 A.2d 818, 823 (Pa. Super 2006).

To convince a court to change a child's goal to adoption, the agency must demonstrate that doing so would be in the best interests of the child. ***See In re R.I.S.***, 36 A.3d 567, 573 (Pa. 2011).

Here, Child has been in foster care for over three years. At the permanency review hearings, the trial court found that DHS had made reasonable efforts to reunify Father with Child. Despite these efforts, however, the trial court determined that Father had "not made progress to alleviate the need for placement." ***See*** N.T. Hearing, at 74.

Moreover, the trial court specifically found that it was in the best interests of Child to be freed for adoption. To that end, Henderson testified that a goal change to adoption was in Child's best interests because she is "in a safe environment now. Her mother and father have struggled for years with maintaining sobriety. [Child] is safe, she's secure, and she's in the best possible environment she can be right now." ***Id.*** at 31.

We find no abuse of discretion in the trial court's order changing Child's permanency goal from reunification to adoption. ***See In re A.K.***, 936 A.2d 528, 532-533 (Pa. Super. 2007) (stating that the appellate court must employ an abuse of discretion standard of review when reviewing a trial court's order changing a dependent child's placement goal to adoption). Accordingly, we affirm both the trial court's order terminating Father's parental rights to Child as well as its order changing Child's permanency goal to adoption.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/10/2021